**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

| | |
|---|---|
| **GUY ATKINSON, SCOTT BURGER, THOMAS RANDALL, and JOSHUA McCANN,**<br><br> Plaintiffs,<br><br>v.<br><br>**MICHIGAN FINANCE AUTHORITY**, a public body corporate,<br><br> Defendant. | Case No.:<br><br>Hon.:<br><br><br> COMPLAINT (CLASS ACTION)<br><br> (Jury Trial Requested)<br><br><br>[Related to Case No. 1:13-cv-00597-JTN] |

Plaintiffs Guy Atkinson, Scott Burger, Thomas Randall, and Joshua McCann ("Plaintiffs"), by and through their counsel, hereby state their class action complaint against Defendant Michigan Finance Authority, showing the Court the following:

<u>**Parties and Jurisdiction**</u>

1.   Plaintiff Guy Atkinson is an adult resident of Clinton County, Michigan.   Until September 2010, Plaintiff Atkinson was MFA's MI-LOAN Program Departmental Specialist.

2.   Plaintiff Scott Burger is an adult resident of Forsyth County, North Carolina.

3.   Plaintiff Thomas Randall is an adult resident of Arlington County, Virginia.

4.   Plaintiff Joshua McCann is an adult resident of DuPage County, Illinois.

5.   Defendant Michigan Finance Authority ("MFA") f/k/a Michigan Higher Education Student Loan Authority ("MHESLA") is an autonomous public body corporate and politic within the Department of Treasury, created pursuant to Executive Reorganization Order 2010-2, MCL 12.194. All relevant authority, powers, duties, functions, and responsibilities of the MHESLA were transferred to the MFA as part of E.R.O. 2010-2, MCL 12.194 effective May 30, 2010.   MCL 12.194(VIII)(E). Pursuant to E.R.O. 2010-2, the governing body of the MHESLA was "abolished" on May 30, 2010. MCL 12.194(IV)(D)(2).

6.      Upon information and belief, MFA cannot be accurately characterized as an arm or alter ego of the State of Michigan and therefore is not entitled to Eleventh Amendment immunity.  The MFA itself was created "as an autonomous public body corporate and politic within the Department of Treasury." MCL 12.194(II)(A).

7.      The MFA shall "exercise its powers, duties, and functions independently of the Department."  MCL 12.194(II)(B).   The MFA is governed by an independent seven person board of directors of specific backgrounds to be appointed by the Governor.  Currently, a majority of the board – five of the seven members – are private individuals, not public officials or state employees. Therefore, the State of Michigan lacks any actual control over the MFA.

8.      In addition, MFA performs a proprietary function by competing with and partnering with private student loan lenders such as banks and other financial institutions and earning revenue through its financing operations.

9.      While MFA is potentially liable for its borrowing and lending activities, the State of Michigan is not.  Thus, this Complaint does not threaten the Michigan Treasury in any way.

10.      Article VII, Paragraph P of E.R.O. 2010-2 states that the MFA "shall assume and be liable for all of the obligations, promises, covenants, commitments, and other requirements under law of the powers transferred to the Authority under this Order and shall perform all of the duties and obligations and shall be entitled to all of the rights of the entities transferred under any of their agreements, resolutions, indentures, or other instruments of law."

11.      Article VIII, Paragraph B of E.R.O. 2010-2 states confirms that "[a]ny suit, action, or other proceeding lawfully commenced by, against, or before any entity affected by this Order shall not abate by reason of the taking effect of this Order. Any suit, action, or other proceeding may be maintained by, against, or before the appropriate successor of any entity affected by this Order."

12.      This Court has subject matter jurisdiction over this Complaint because it alleges causes of action arising under the laws of the United States, including, but not limited to, the Higher Education Act, 20 U.S.C. 1070, *et seq.*, and the applicable U.S. Department of Education regulations.  The Complaint arises under the rights and obligations under the federal Master Promissory Notes referenced in and attached to the Complaint and those federal loan contracts include a federal choice of

law provision. *See, e.g.,* Exhibits A, D, and E at 2 ("Governing Law and Notices: The terms of this MPN will be interpreted in accordance with the applicable federal statutes and regulations, and the guarantor's policies. Applicable state law, except as preempted by federal law, may provide for certain borrower rights, remedies, and defenses in addition to those stated in this MPN."). Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. §1331. *See, e.g., Illinois Psychiatric Hospital Company, Inc. v. Health Care Service Corp.,* 1992 WL 166823, *3 (N.D. Ill., July 9, 1992)(confirming federal subject matter jurisdiction based on federal choice of law provision); *Danis Industries Corp. v. Fernald Environmental Restoration Management Corp.,* 947 F.Supp. 323 (S.D. Ohio, 1996) (confirming federal subject matter jurisdiction based upon valid federal choice-of-law provision and United States having a substantial interest in the contract being litigated).

13.     In addition and/or in the alternative, this Court has diversity jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d) ("CAFA"). Diversity of citizenship between the parties exists and the amount-in-controversy requirements of CAFA are met. Specifically, this lawsuit is filed on behalf of a class of plaintiffs, including non-residents of Michigan, and involves an amount-in-controversy in excess of $5 million. In addition, this Court has traditional diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) over the claims of the Subclass. Specifically, all members of the Subclass are completely diverse from the defendants and seek damages in excess of $75,000.00.

14.     None of the exceptions apply to the Court's CAFA jurisdiction. Specifically, the exception in 28 U.S.C. §1332(d)(3) does not apply because, based upon the investigation conducted to date, more than two-thirds of Class members may reside outside of the State of Michigan. Moreover, one hundred percent of the Subclass are non-residents of Michigan.

15.     A recent article in the *Detroit News* confirmed that a significant number of Michigan graduates, and thus a significant percentage of the Class, leave the State of Michigan. According to the article, the number of Michigan State graduates leaving the State of Michigan is 49 percent according to a school survey. The number of University of Michigan graduates leaving the State of Michigan is higher at 53 percent. Overall, half of Michigan's college grads now leave the state within a year of graduation. Ron French, *Half of university grads flee Michigan*, Detroit News (April 3, 2009),

available online at <http://www.detroitnews.com/article/20090403/METRO/904030378>. A true and correct copy of the article has been attached as Exhibit "B".

16.     This migration is not just applicable to recent graduates. Of all of the University of Michigan's 535,000 living alumni, sixty percent (60%) live outside of the State of Michigan according to its alumni association. Kellie Woodhouse, *Find out where they go: University of Michigan graduates leaving tree city for the big city*, ANNARBOR.COM (April 1, 2013), available online at <http://annarbor.com/news/where-u-m-alumni-live/>. A true and correct copy of the article has been attached as Exhibit "C".

17.     The exception in 28 U.S.C. § 1332(d)(4) does not apply for the same reasons and because two other class actions were filed asserting the same or similar factual allegations against the MFA on behalf of the same or other persons. *See Moulton et al. v. MFA et al.*, Case No. 11-000055-MK (Mich. Ct. of Claims, filed June 3, 2011); *Israel et al. v. MHESLA et al.*, Case No. 12-000022-MK (Mich. Ct. of Claims, filed March 5, 2012).

18.     The exception in 28 U.S.C. § 1332(d)(5)(A) does not apply because the MFA is not a state, state official, or governmental entity against whom the district court may be foreclosed from ordering relief.

19.     The exception in 28 U.S.C. § 1332(d)(5)(B) does not apply because the Class and Subclasses consists of more than 100 individuals.

20.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391. MFA is headquartered and resides in this judicial district, Plaintiff Atkinson resides in this judicial district, and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this judicial district.

21.     This case is related to the action styled *Michigan Finance Authority v. Kiebler et al.,* Case No.: 1:13-cv-00597-JTN which was removed to this Court and subsequently assigned to The Honorable Janet T. Neff.

## Notice Under MCL 600.6431

22. Plaintiffs believe that they were not and are not required under MCL 600.6431 and/or related Michigan law to provide a Notice of Intention to File a Claim to Defendant Michigan Finance Authority.

23. Out of an abundance of caution, and without waiving their rights to dispute the application of MCL 600.6431 to their class action complaint, Plaintiffs have or will promptly provide timely notice under MCL 600.6431.

## Nature of Action

24. This complaint is brought as a representative and class action under Federal Rule of Civil Procedure 23.

25. Through this complaint, Plaintiffs challenge MFA's common course of misconduct in breaching the express terms of standard-form federal student loan contracts.

26. To obtain loans for their secondary educations, Plaintiffs, like all other members of the Class, executed a standard-form Master Promissory Note ("MPN") that sets forth their rights and obligations in obtaining a student loan under the Federal Family Educational Loan Program ("FFELP").

27. The FFELP covers three types of loans: Stafford Loans, PLUS Loans, and Consolidation Loans. This Complaint covers persons who became obligated to pay back a Stafford Loan or PLUS Loan to MFA under a standard-form MPN (hereinafter "MPN borrowers").

28. Upon information and belief, all Stafford Loans are governed by a federal form MPN identified as OMB Form No. 1845-0006. An exemplar of the applicable MPN executed for initial loans up to September 30, 2005 is attached as Exhibit "A". An exemplar of the applicable MPN executed for loans through February 29, 2008 is attached as Exhibit "D". An exemplar of the applicable MPN executed for loans through July 31, 2011 is attached as Exhibit "E".

29. Upon information and belief, all PLUS Loans are governed by a federal form MPN identified as OMB Form No. 1845-0069. An exemplar of the applicable MPN executed for initial loans up to August 31, 2010 is attached as Exhibit "F".

30.     All of the student loan contracts at issue (the MPNs) in this case are installment contracts involving monthly payments over repayment periods that range from ten to twenty-five years.

31.     MHESLA implemented its "Michigan Students First" Borrower Benefit Program to operate in a uniform and systematic manner. *See* MHESLA Flow Chart produced in response to a Freedom of Information Act request, a true and correct copy of which is attached hereto as Exhibit "G." Upon completion of each step of the program, MPN borrowers were notified by mail. *Id.*

32.     By obtaining a student loan from MHESLA, or from a lender that participated with MHESLA by selling the loan to the Michigan State Secondary Market, said loans were "automatically" eligible for the contractual benefits provided by MHESLA under the program.

33.     MHESLA was contractually obligated to reduce the interest on federal FFELP Loans to 0% upon Plaintiffs and all other MPN borrowers making thirty-six months of on-time payments to MFA. *See* MHESLA form disclosure statement, a true and correct exemplar of which is attached hereto as Exhibit "H" ("STEP TWO: Get a zero percent (0%) interest rate after you make your first 36 months of loan payments on time. That's right-no more interest!").

34.     Pursuant to the MPN, the form disclosure statements such as Exhibit "H" are incorporated by reference into the MPN.

35.     As used herein, "disclosure statements" refers to both the "initial disclosure statement" described in 34 C.F.R. § 682.205(a) and the "disclosures at or prior to repayment" described in 34 C.F.R. § 682.205(c).

36.     Pursuant to 34 C.F.R. § 682.205(a), a lender must disclose certain information to a borrower, including, but not limited to the actual interest rate and when the borrower is required to pay the interest that accrues on the loan.

37.     Pursuant to 34 C.F.R. § 682.205(c)(2)(x) and (xi), the lender shall provide the borrower with "information on any special loan repayment benefits offered on the loan, including benefits that are contingent on repayment behavior, and any other special loan repayment benefits for which the borrower may be eligible that would reduce the amount or length of repayment; and at the request of the borrower, an explanation of the effect of a reduced interest rate on the borrower's total payoff amount and time for repayment" and, "[i]f the lender provides a repayment benefit, any limitations on

that benefit, any circumstances in which the borrower could lose that benefit, and whether and how the borrower may regain eligibility for the repayment benefit."

38.     The Michigan Students First program was a "repayment benefit" under the U.S. Department of Education regulations.

39.     None of the initial disclosures contained any limitations of the Michigan Students First program other than the requirements to make 36 months of on-time payments.

40.     Pursuant to the MPN, once 36 months of on time payments are made, the interest rate on an eligible federal student loan is reduced to zero percent (0%). Specifically, the MSF Stafford and PLUS loans must have a) "A first disbursement date on or after January 1, 2003"; and b) "been originated by MHESLA or purchased from a participating lender." *See* MHESLA form 0% Interest Rate Notice, a true and correct exemplar of which is attached hereto as Exhibit "I." The MHESLA Notice further provides, "PLEASE NOTE: Federal Consolidation Loans do not qualify for MSF benefits. If you consolidate an MSF-eligible loan, you will lose the 0% interest benefit and the 0% interest rate will not be used in determining the interest rate for the consolidation loan." *Id*.

41.     Effective June 30, 2010, MHESLA purportedly ceased reducing the interest to 0% for all MPN borrowers who, like Plaintiffs, had not made their 36 months of on-time payments by June 30, 2010.

42.     There is no evidence that the MHESLA board or MFA board, at any relevant time, authorized such action.

43.     For instance, in June 2010, Plaintiff Burger received correspondence dated June 10, 2010, on MHESLA letterhead purporting to "advise" Plaintiff Burger that his "student loan(s) with the [MHESLA] will no longer become eligible for an interest rate subsidy from MHESLA." The letter was signed by "MHESLA". A true and correct copy of the letter is attached hereto as Exhibit "J" (the "June 10th Correspondence").

44.     However, the content of the correspondence, including the terms and contractual provisions involved, was ambiguous. Moreover, the correspondence was defective given that MHESLA had been abolished as a matter of law more than ten days before the correspondence was

dated and all legal rights, obligations, and ownership of Plaintiff Burger's loans with MHESLA had been transferred to the MFA as a matter of law on May 30, 2010. MCL 12.194.

45. In addition, the correspondence was defective under 34 C.F.R. § 682.205(a) and (c) given that MFA and/or MHESLA's purported ability to terminate said program and/or require completion of all payments to be made by a certain deadline were not contained in the initial disclosures and/or MPNs.

46. As a matter of law, the June 10th Correspondence could not have been authorized by an abolished Authority, the MHESLA, given that the board was abolished on May 30, 2010 and therefore does not, and cannot, constitute proper notice under the MPN. In addition, because all of MHESLA's student loans were transferred to MFA on May 30, 2010, MHESLA was no longer the "lender" under the MPNs on the date the June 10th Correspondence was sent to Plaintiff Burger.

47. No Plaintiff has ever received any notification from MFA or any lender then holding their MSF-eligible student loans that purportedly terminates or repudiates the terms of the MSF contractual benefit.

48. MFA purportedly reduced the interest rate to 0% for those MPN borrowers who had made 36 months of on-time payments by June 30, 2010 but, in breach of the MPN, did not reduce the interest rate to 0% for those MPN borrowers who had not missed a payment but had not reached 36 months of on-time payments by June 30, 2010.

49. Further, upon information and belief, as a matter of policy and/or practice, MFA agrees to honor and apply the 0% interest contract term for those MPN borrowers who have notified MFA that they intend to pursue a claim against MFA for refusing to reduce the borrower's interest rate to 0% upon completing 36 months of on-time payments.[1] To date, MFA has not agreed to honor and apply the 0% interest contract term to Plaintiffs' student loans or to the Class members' loans, despite their record of making 36 months of on-time payments to MFA.

50. The MPN does not authorize MFA to treat MPN borrowers differently.

---

[1] *See Moulton et al. v. MFA et al.*, Case No. 11-000055-MK (Mich. Ct. of Claims, filed June 3, 2011); *Israel et al. v. MHESLA et al.*, Case No. 12-000022-MK (Mich. Ct. of Claims, filed March 5, 2012).

51.     Plaintiffs, on behalf of themselves and all persons similarly situated, seek to hold MFA liable for the breach of the standard-form MPNs and to recover for themselves and the Class all damages resulting from MFA's common breach of contract.

**<u>Factual Allegations</u>**

**A.     The Federal Family Education Loan Program**

52.     The Higher Education Act ("HEA") of 1965, now codified at 20 U.S.C. §§ 1001 – 1155, was enacted to keep the college door open to all students of ability, regardless of socioeconomic background.

53.     As part of that effort, Congress established the FFELP, a system of loan guarantees intended to encourage lenders to loan money to students and their parents on favorable terms.

54.     The Secretary of the Department of Education ("DOE") is authorized to prescribe regulations necessary to carry out the purposes of the FFELP.   Pursuant to that authority, the DOE has promulgated regulations currently codified at 34 C.F.R. §§ 682.100 – 682.800.

55.     The FFELP governs a series of transactions related to student loans, including transactions between lenders and student borrowers.  Lenders that chose to participate in the FFELP must abide by the terms of the FFELP.  While lenders may sell or assign their loans to third-parties, those third-parties must also abide by the terms of the FFELP.

56.     The FFELP governs four types of loans, including Stafford Loans and PLUS Loans.  A Stafford Loan, which is made to the student, may be either subsidized or unsubsidized.  For subsidized Stafford Loans, the federal government pays interest on the loan during specified periods, such as when the student borrower is attending school on at least a part-time basis. For unsubsidized Stafford Loans, the student is responsible for all accrued interest from the time the loan is dispersed and the government pays none of it.

57.     PLUS loans are made to graduate students and the parents of college students.

58.     Pursuant to the HEA and DOE's regulations, lenders participating in the FFELP must issue common application forms and promissory notes when lending money to students under the FFELP, including a free application form and MPN. The purpose of these common forms is to

standardize the terms and formatting to help applicants understand their rights and obligations in securing a student loan through the FFELP.

59.     This class action counterclaim seeks to enforce a standard term found in all MPNs signed by all persons who became obligated to pay back a FFELP Loan to the MHESLA, which is now known as the MFA.

**B.      The Michigan Higher Education Student Loan Authority**

60.     The Michigan Legislature established the first student financial aid programs for Michigan residents in 1966 with the purpose of providing financial assistance to Michigan residents who were pursuing postsecondary education degrees.

61.     In 1975, the Michigan Legislature created the MHESLA as a public body corporate and politic created within the Michigan Department of Education.    In 1995, Governor John Engler transferred MHESLA's authority, powers, duties, functions, and responsibilities from the Department of Education to the Department of Treasury.

62.     Upon information and belief, from 1975 to 1988, the MHESLA served as "a lender of last resort" as it was not authorized to loan money to Michigan students unless they first demonstrated that they were unable to obtain a loan from a commercial lender.

63.     Upon information and belief, in 1988, MHESLA received legislative authority to participate in the secondary market for federal student loans, including Stafford Loans and PLUS Loans.   Accordingly, beginning in 1988, MHESLA purchased Stafford Loans and PLUS Loans from commercial, non-profit and other lenders and, upon such purchases, assumed the rights and obligations of a lender under the FFELP.

64.     Upon information and belief, to obtain capital to originate loans and to purchase loans on the secondary market, MHESLA used its statutory authority to borrow funds through the issuance of tax-exempt and taxable bonds.   MHESLA placed tax-exempt bond offerings in 2002, 2004, 2005, and 2007 to provide $1.7 billion of capital to purchase student loans subject to MSF.

65.     Upon information and belief, upon originating or purchasing a subsidized Stafford Loan, MHELSA earned money on the spread between: (a) the interest rate MHESLA paid on the

bonds that funded MHESLA; and (b) the interest rate the federal government paid to MHESLA on the Stafford Loan under the FFELP (hereinafter "Interest Spread").

66. Upon information and belief, under the FFELP, MHESLA could retain up to the first 2% of any Interest Spread to cover administrative costs but could not retain any Interest Spread in excess of 2%. More specifically, MHESLA was required to book as an "accumulated excess earnings liability" or arbitrage the amounts earned on the Interest Spread in excess of 2% and to return the excess earnings to the federal government or to the MPN borrowers.

67. Upon information and belief, from 1988 to 2003, MHESLA continued to originate and purchase FFELP loans, amassing a significant student loan portfolio. Upon information and belief, as of 2003, that portfolio had generated excess surplus earnings on the Interest Spread (*i.e.*, amounts in excess of the first 2%).

68. Upon information and belief, rather than return the funds to the federal government, MHESLA decided in 2003 to create a vehicle through which MHELSA could return the funds to the MPN Borrowers. That vehicle was and remains the Michigan Students First Program.

**C. The Michigan Students First Program**

69. MHESLA established the Michigan Students First program (MSF Program) as a borrower benefits program that applied to all federal Stafford Loans (subsidized and unsubsidized) and PLUS Loans that were originated by MHESLA or purchased by MHESLA on the secondary market and were disbursed to the borrower between January 1, 2003 and April 17, 2008, the date on which MHESLA ceased its loan origination and loan purchasing activities.

70. Under the MSF Program, MHESLA agreed to, *inter alia*, reduce the interest rate of the MPN Borrowers' loans to 0% for borrowers who made thirty-six months of on-time payments. The MHESLA offered the 0% interest term to every borrower who executed a MPN and who became obligated to pay back the FFELP Loan to MHESLA.

71. MHESLA memorialized the 0% interest term in the written disclosures it was required by law to provide to the borrowers at the time MHESLA either originated the FFELP Loan or purchased the FFELP Loan on secondary market.

72.    Upon information and belief, MHESLA's standard-form disclosure statements advised borrowers that they automatically qualified for the 0% interest term by receiving a FFELP Loan from MHESLA or from a lender that participates in the MSF program by selling the FFELP Loan to MHESLA on the secondary market.  *See*, *e.g.*, Exhibit "H."

73.    In doing so, the MHESLA standard-form disclosures state that the MPN borrower would get a 0% interest rate after making the first 36 months of loan payments on time and would continue to receive the 0% interest rate if the borrower continued to make on-time payments for the remainder of the loan repayment period.  *See* Exhibit "H."

74.    At no time did MHESLA use disclosure statements that advised the MPN borrower that the 0% interest rate would not be applied in the event the borrower did not make the 36 months of on-time payments by June 30, 2010.

75.    At no time did MHESLA use any disclosure that advised the MPN borrower that MHESLA reserved the right to rescind the 0% interest rate term at any time in MHESLA's discretion, regardless of whether the borrower had made the first 36 months of loan payments on time.

76.    At all times, MHESLA used standard form disclosures that stated in clear terms that the MPN borrower automatically qualified for the 0% interest term and that MHESLA would, without exception, apply the 0% interest rate upon the borrower making the first 36 months of payments on time.  *See* Exhibits "I" and "H."

77.    Only payments received while a FFELP Loan was in an active repayment status were included in the determination of whether a borrower had made the first 36 months of payments on time. An active repayment status means a monthly payment must be received on the loan. Because no payment must be received during an in-school, grace, forbearance, or deferment status, the repayment status is not considered active during those periods.

78.    Upon information and belief, as of February 12, 2010, approximately $500 million in FFELP Loans were MSF Program pending, meaning that borrowers were either (1) deferred or making on-time payments, (2) had not consolidated their loans, and (3) had not yet qualified for the 0% interest rate by making their 36th on-time payment.

79.     Upon information and belief, on or about February 12, 2010, MHESLA directed its loan servicing agents to suspend all correspondence with MPN borrowers regarding the 0% interest rate to prevent those borrowers from receiving notification that they had qualified for the 0% interest rate.

80.     Upon information and belief, on or about June 10, 2010, the MFA, as successor to MHESLA, purportedly executed a "Certificate Regarding Termination of Borrower Benefits" that terminated the MSF program effective June 30, 2010 for MPN borrowers who were MSF pending, but had not yet qualified for the 0% interest rate by making their 36 months of on-time payments. Said certificate has not been made available to the public.

81.     Upon information and belief, said certificate was not authorized by the applicable MFA and/or MHESLA governing board.

82.     MFA's unilateral termination of the 0% interest rate term coincided with the termination of FFELP, which was eliminated following the passage of the Health Care and Education Reconciliation Act of 2010 on March 26, 2010.  Under that Act, no new federal loans were permitted to be made under the FFELP after June 30, 2010.

83.     Upon information and belief, the MFA was unable to determine how much the MSF Program would actually cost due to a lack of information and resources.  As a result, MFA's decision to terminate the MSF program was uninformed, arbitrary, and capricious, and, as alleged below, a breach of the MPNs.

**D.      The Student Loan Process and the Relevant Standard-Form Contracts**

84.     To obtain a student loan under the FFELP, a borrower completed a Free Application for Federal Student Aid (FAFSA) and then electronically submitted the FAFSA to the DOE and the school of their choice.

85.     If the borrower qualified for a FFELP Loan, the borrower's school typically provided to the borrower a list of suggested lenders who participated in the FFELP.

86.     Upon selecting a lender, a borrower was required to execute an MPN that set forth the borrower's rights and obligations in obtaining a FFELP Loan.   The MPN incorporates by reference the

Borrower's Rights and Responsibilities Statement that, by federal law, must accompany and be attached to all MPNs.

87.    In addition, the MPN incorporates by reference the disclosure statement that the lender transmits to the borrower upon the execution of the MPN.   The disclosure statement sets forth the amount of the loan, the interest rate, and additional terms of the specific FFELP Loan.

88.    Upon information and belief, at all relevant times, the MPN for FFELP Loans included the following standard contract term for the interest rate applicable to a FFELP Loan:

Interest

Unless my lender notifies me in writing of a lower rate(s), the rate(s) of interest for my loans are those specified in the Act. The interest rate information is presented in the Borrower's Rights and Responsibilities Statement accompanying this MPN. ***The interest rate is presented in a disclosure statement that is issued to me.*** (emphasis added).

89.    Upon information and belief, during the period January 1, 2003 to 2010, MHESLA and/or its loan servicing agent transmitted to borrowers who originated an FFELP Loan with MHESLA a disclosure statement that advised the borrower that the interest rate on the loan would be reduced to 0% upon the borrower making the first 36 monthly payments on time.  *See* Exhibit "H."

90.    Upon information and belief, during the period January 1, 2003 to 2010, MHESLA and/or its loan servicing agent transmitted to borrowers who had a FFELP Loan that was purchased by MHESLA a disclosure statement that advised the borrower that the interest rate on the FFELP Loan would be reduced to 0% upon the borrower making the first 36 months of payments on time. *See* Exhibit "H."

91.    Upon information and belief, at no time did MHESLA and/or its loan servicing agent transmit to borrowers a disclosure statement that advised the borrower that MHESLA reserved the right to rescind, cancel, change, amend, revoke, withdraw, terminate, discontinue, suspend, cease, modify, and/or alter the terms under which the borrower would be entitled to have the interest rate on his or her FFELP Loan reduced to zero percent.

**E.    Plaintiffs' Contracts with MFA**

92.    Copies of all of the executed MPNs are in the possession of the MFA and its affiliates.

93.     Plaintiff Atkinson obtained federal PLUS Loans to finance his child's undergraduate education at Michigan State University, with a private commercial lender serving as the direct lender. Plaintiff Atkinson secured the federal PLUS Loans by executing an MPN.   Once the PLUS loan was fully disbursed, MHESLA purchased the loan on the secondary market.

94.     On August 17, 2007, Plaintiff Atkinson obtained Michigan Students First-eligible student loan totaling approximately $17,108.00, which was fully disbursed in or around December 2007.   Plaintiff Atkinson began repaying the PLUS loan in or around January 2007. The current interest rates on said loan is 7.65%.

95.     Plaintiffs Burger and McCann obtained federal Stafford Loans to finance their law school education at Michigan State University College of Law, a private non-profit corporation.

96.     Plaintiffs Burger and McCann secured federal student loans by executing an MPN.

97.     Upon information and belief, Plaintiffs Burger and McCann's federal Stafford loans under the MPN were issued/made by the school, Michigan State University College of Law, a private non-profit corporation who acted as the lender.   Upon information and belief, MHESLA later purchased their loans from MSU Law.

98.      All applicable MPNs contained the following clause:

> If a particular loan under this MPN is made by the school, or if the proceeds of a particular loan made under this MPN are used to pay tuition and charges of a for-profit school that refers loan applicants to the lender, or that is affiliated with the lender by common control, contract, or business arrangement, *any lender holding such loan is subject to all claims and defenses that I could assert against the school with respect to such loan.* My recovery under this provision shall not exceed the amount I paid on such loan.

*See, e.g.,* Exhibit "A", at 2 (emphasis added).

99.     In addition, 34 C.F.R. § 682.209(k) confirms that "[a]ny lender holding a loan is subject to all claims and defenses that the borrower could assert against the school with respect to that loan if… (1) [t]he loan was made by the school or a school-affiliated organization."

100.     Upon information and belief, both of Plaintiffs Burger and McCann's Stafford loans under the MPN were issued/made by the school, Michigan State University College of Law, a private non-profit corporation who acted as the lender.

101.     As such, any lender holding such a loan, currently the MFA, is subject to all claims and defenses that Plaintiffs Burger and McCann could assert against the school with respect to such loan.

102.     From 2005 to 2007, Plaintiff McCann obtained Michigan Students First-eligible student loans totaling approximately $42,345.00. Since disbursement, additional capitalized interest charges have accrued. The current interest rates on said loans are approximately 3.8%.

103.     From 2006 to 2008, Plaintiff Burger obtained Michigan Students First-eligible student loans that currently total approximately $73,935.  Since disbursement, additional capitalized interest charges have accrued.  In addition, Plaintiff Burger obtained federal Direct loans from 2008 to 2010. The current interest rates on said loans are approximately 6.875%.

104.     After graduation, Plaintiff Burger refrained from consolidating his student loans due to the MSF program requirements.

105.     As a direct result of the June 10th Correspondence, Plaintiff Burger began investigating loan consolidation options.  Ultimately, Plaintiff Burger consolidated all of his Stafford and Direct loans and began repayment initially over a ten-year, and later a twenty-five year period.

106.     Plaintiff Randall obtained federal Stafford Loans from National City Bank, a private commercial lender, to finance his undergraduate living expenses while studying at Michigan State University on an academic scholarship. *See* Exhibit "K".

107.     From 2006 to 2007, Plaintiff Randall obtained Michigan Students First-eligible student loans totaling $25,050.00. The current interest rates on said loans vary from 2.39% to 6.8%.

108.     Upon information and belief, MHESLA later purchased Randall's loans from the commercial lender.

109.     To obtain their FFELP loans, all of the Plaintiffs completed the FAFSA electronically and then executed a standard-form MPN.  *See*, *e.g.,* Exhibit "K" (Plaintiff Randall's counterparts).

110.     All of the Plaintiffs executed a standard-form MPN that states that the interest rate on the loan would be the rate stated in the disclosure statement that received from their lender and that the MPN incorporates by reference that disclosure statement.

111.     Upon information and belief, MHESLA purchased Plaintiffs' FFELP loans on the secondary market and assumed all rights and obligations as the lender under the MPN. Upon further

information and belief, upon purchasing the loans, MHESLA transmitted to Plaintiffs a standard form disclosure statement that represented that their loans automatically qualified for the MSF Program and that the interest rate on their FFELP loans would be reduced to zero percent upon Plaintiffs making the first 36 months of payments on time. This process appears consistent with the MHESLA Flow Chart. *See* Exhibit "G."

112. Upon information and belief, none of the disclosure statements provided to Plaintiffs, or any other correspondence for that matter, stated that the terms of the 0% interest rate was subject to cancellation at MHESLA's discretion.

113. Beginning in or around January 2008, Plaintiff Atkinson began making on-time payments.

114. Plaintiff Atkinson has since made more than thirty-six months of on-time monthly payments entitling him to a zero percent (0%) interest rate reduction on those loans under the terms of his MPN.

115. Plaintiff Atkinson completed making thirty-six months of on-time payments in or around January 2011. Plaintiff Atkinson has never been late in making a payment on those loans.

116. Plaintiff McCann began repaying his applicable student loans on February 20, 2010.

117. Plaintiff McCann has since made more than thirty-six months of on-time monthly payments entitling him to a zero percent (0%) interest rate reduction on those loans under the terms of his MPN.

118. Plaintiff McCann completed making thirty-six months of on-time payments on or around March 17, 2013. Plaintiff McCann has never been late in making a payment on those loans.

119. Plaintiff Burger began repaying his applicable consolidated Stafford student loans in or around November 2009.

120. Plaintiff Burger has since made more than thirty-six months of on-time monthly payments entitling him to a zero percent (0%) interest rate reduction on the Stafford student loans under the terms of his MPN.

121. Plaintiff Burger completed making thirty-six months of on-time payments in or around November 2012. Plaintiff Burger has never been late in making a payment on those loans.

122.    After graduating from Michigan State, Plaintiff Randall moved to the Washington, D.C. area to attend law school.  During the period that Plaintiff Randall was in-school, all of his loans were deferred and no payments were due.  Thus, Plaintiff Randall has never made a late payment because no payment has ever been due on any of his MFA student loans.

123.    Plaintiff Randall graduated from law school in May 2013 and is currently scheduled to begin repaying the applicable Stafford loans in October 2013.

124.    Plaintiff Randall has obtained gainful employment at a law firm in New York and intends to make thirty-six months of on-time payments starting in October 2013.

125.    Once Plaintiff Randall has made thirty-six months of on-time payments, he will be entitled to a zero percent (0%) interest rate reduction on those loans under the terms of his MPN. Assuming Plaintiff Randall does not seek any additional deferments, he should complete making thirty-months of on-time payments in October 2016, at which time Defendant MFA will be required to perform its contractual obligation to reduce the interest rates on all of Plaintiff's applicable student loans to a zero percent (0%) interest rate.

126.    Plaintiffs have performed and continue to perform all of the duties and obligations required of them under the terms of their MPN.

### Injury and Damage

127.    Plaintiffs and the members of the Class suffered injury, incurred damage and financial loss as a result of MFA's conduct complained of herein.  As many as 105,000 class members carry an aggregate class-wide loan balance as high as $750 million, meaning each one-percent reduction in interest equals approximately $7.5 million in interest savings to the class *per year*, with loan terms as long as 25 years.

### Class Action Allegations

128.    Plaintiffs bring this Class action against MFA on behalf of themselves and all other person similarly situated.

129.    This action is brought and may be maintained as a class action against MFA pursuant to Rule 23 of the Federal Rules of Civil Procedure.

130.    This action satisfies the numerosity, commonality, typicality, adequacy, predominance and superiority requirements with respect to the putative class.   The community of interests in the litigation is well defined and the proposed class is ascertainable.

131.    **Class Definition:**   The Class Plaintiffs Atkinson, Burger, and McCann seek to represent in this action is defined as follows:

> All individuals who: (a) had an existing, unconsolidated FFELP Loans held and/or owned by the Michigan Higher Education Student Loan Authority (MHESLA) and/or the Michigan Finance Authority (MFA) as of June 30, 2010 other than those for which MHESLA and the MFA served as the direct lender; (b) had not missed a loan payment but had not made their 36 months of on-time payment by June 30, 2010; and (c) have not received a reduction of the interest rate on their loan to zero percent

The "Class Period" dates back six years (or the length of the longest applicable statute of limitations for any claim asserted) from the date this action was commenced and continues through the present and the date of judgment.  Specifically excluded from the Class are: (a) any officers, directors or employees of MFA; (b) any judge assigned to hear this case (or spouse or immediate family member of any assigned judge); (c) any employee of the Court; (d) any juror selected to hear this case; and (e) all attorneys' of record and their employees.

132.    As used herein, the term "Class" includes the foregoing Class definition, but also includes the following Subclass definitions.

133.    Foreign Subclass Definition. The "Foreign Subclass" Plaintiffs Burger and McCann seek to represent in this action is defined as follows:

> All individuals who: (a) had an existing, unconsolidated FFELP Loans held and/or owned by with the Michigan Higher Education Student Loan Authority (MHESLA) and/or the Michigan Finance Authority (MFA) as of June 30, 2010 other than those for which MHESLA and the MFA served as the direct lender; (b) had not missed a loan payment but had not made their 36 months of on-time payment by June 30, 2010; (c) have not received a reduction of the interest rate on their loan to zero percent; (d) do not reside in the State of Michigan; and (e) and whose future interest payments may exceed $75,000.00.

The "Foreign Subclass Periods" dates back six years (or the length of the longest applicable statute of limitations for any claim asserted) from the date this action was commenced and continues through the present and the date of judgment.  Specifically excluded from the Subclass are: (a) any officers, directors or employees of MFA; (b) any judge assigned to hear this case (or spouse or immediate family member of any assigned judge); (c) any employee of the Court; (d) any juror selected to hear this case; and (e) all attorneys' of record and their employees.

134.    Calculating the potential damages of the Subclass is possible if the interest rates and a repayment period is known.  The interest rates for Stafford Loans can be up to 6.8%, for PLUS loans of 8.5%, and consolidated loans of up to 8.25%.[2] The applicable MPNs all allow for an extended repayment plan of up to 25 years.  For example, if a borrower makes three years of on-time payments, they could potentially be making payments for up to 22 years.  Thus, a borrower with $85,000 in loan debt paying 6.8% interest on a Stafford loan for 22 years will pay $79,071.59 over the remaining term of the loan.  A borrower with $85,000 in loan debt paying 8.25% interest on a consolidated loan for 22 years will pay $99,506.89 in interest over the remaining term of the loan.

135.    The Consolidation Subclass Definition. The "Consolidation Subclass" Plaintiff Burger seek to represent in this action is defined as follows:

> All individuals who: (a) had an existing FFELP Loans held and/or owned by the Michigan Higher Education Student Loan Authority (MHESLA) and/or the Michigan Finance Authority (MFA) as of June 30, 2010 other than those for which MHESLA and the MFA served as the direct lender; (b) had not missed a loan payment but had not made their 36 months of on-time payment by June 30, 2010; (c) and consolidated their existing Stafford Loan or PLUS Loan after receiving the June 10th Correspondence.

136.    The "Consolidation Subclass Periods" dates back six years (or the length of the longest applicable statute of limitations for any claim asserted) from the date this action was commenced and continues through the present and the date of judgment.  Specifically excluded from

---

[2] Office of the Auditor General, Financial Audit of the Michigan Finance Authority: October 1, 2011 through September 30, 2012, Report No. 271-0340-13 (January 2013), at 62-63, available online at <http://audgen.michigan.gov/finalpdfs/12_13/r271034013.pdf>.

the Subclass are: (a) any officers, directors or employees of MFA; (b) any judge assigned to hear this case (or spouse or immediate family member of any assigned judge); (c) any employee of the Court; (d) any juror selected to hear this case; and (e) all attorneys' of record and their employees.

137.  **Numerosity of the Class.**  Members of the Class are so numerous that their individual joinder herein is impracticable.  The precise number of members of the Class and their addresses are presently unknown to Plaintiffs, but is believed to exceed 105,000 people.

138.  **Ascertainable Class.** The proposed Class is ascertainable from objective criteria and the business records of MFA. Notice may be accomplished by sending written notice via first class and/or electronic mail to all Class members.

139.  **Common Questions of Fact and Law Exist and Predominate over Individual Issues.**  There is a well-defined community of interest in the questions of law and fact involved affecting the parties to be represented. These common questions of law and fact exist as to all members of the Class and predominate over the questions affecting only individual members of the Class.  These common legal and factual questions include without limitation:

    a)  What are Plaintiffs and the Class' and/or Subclasses' rights under the terms of the standard- form MPN?

    b)  Whether the MFA has breached its contracts with Plaintiffs and the Class and/or Subclasses' by terminating the interest rate reduction due under the terms of MSF Program as incorporated into the standard-form MPN?

    c)  Whether Plaintiffs and the Class and/or Subclasses' have been damaged by the wrongs complained of herein, and, if so, what is the proper measure of damages?

    d)  Whether Plaintiffs and the Class and/or Subclasses' are entitled to injunctive relief?

    e)  Whether Plaintiffs and the Class and/or Subclasses' are entitled to declaratory relief?

140.  **Typicality.** Plaintiffs' claims are typical of the claims of members of the Class. Typical of other class members, Plaintiffs obtained at least one FFELP Loan under the FFELP that was purchased by MSF during the class period. Plaintiffs and the Class members each sustained damages arising from MFA's common course of wrongful conduct, as alleged more fully herein.  Plaintiffs' claims are founded on the same legal theories as those of the Class.  Proof that MFA breached the standard-form MPN will be identical to proof that MFA breached the MPN in other class member's transactions.  The effort that Plaintiffs undertake to pursue their own claims will significantly benefit the Class members because of the identical nature of the issues across the Class.

141.  **Adequacy of Representation.**  Plaintiffs will fairly and adequately represent and protect the interest of the members of the Class.  Plaintiffs share a common interest with the Class members, with respect to the conduct of MFA herein and redress of injury.  Plaintiffs have suffered injury-in-fact as a result of the conduct of the MFA, as alleged herein.  Plaintiffs have retained counsel who are competent and experienced in the prosecution of complex consumer fraud, mass tort and class actions.  Plaintiffs and their counsel intend to prosecute this action vigorously and faithfully for the benefit of the Class members.  Plaintiffs have no interests contrary to the class members, and will fairly and adequately protect the interests of the Class.

142.  **Community of Interest.**  The proposed Class has a well defined community of interest in the questions of fact and law to be litigated.  The common questions of law and fact are predominant with respect to the liability issues, relief issues and anticipated affirmative defenses.  The named Plaintiffs have claims typical of the Class members.  Without limitation, as a result of MFA's conduct alleged herein, Plaintiffs were: (a) injured; (b) deprived of the zero interest rate on the FFELP Loan; and (c) sustained pecuniary loss in an ascertainable amount to be proven at the time of trial.

143.  **Superiority of Class Adjudication.**  The certification of a class in this action is superior to the litigation of a multitude of cases by members of the putative class. Class adjudication will conserve judicial resources and will avoid the possibility of inconsistent rulings. Moreover, there are Class members who are unlikely to join or bring an action due to, among other reasons, their reluctance to spend large sums of time and money to recover what may be a relatively modest

individual recovery. Equity dictates that all persons who stand to benefit from the relief sought herein should be subject to the lawsuit and hence subject to an order spreading the costs of the litigation among the class members in relationship to the benefits received.  The damages, restitution and other potential recovery for each individual member of the Class are modest relative to the substantial burden and expense of individual prosecution of these claims. Given the amount of the individual Class members' claims, few, if any, Class members could or would afford to seek legal redress individually for the wrongs complained of herein.  Even if the members of the Class themselves could afford individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties and the court system presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

144.    In the alternative, the above-referenced Class may be certified because:

a) The prosecution of separate actions by the individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual Class members' claims which would establish incompatible standards of conduct for MFA;

b) The prosecution of separate actions by individual members of the Class would create a risk of adjudications which would as a practical matter be dispositive of the interests of other members of the Class who are not parties to the adjudications, or which would substantially impair or impede the ability of other Class members to protect their interests; and,

c) MFA has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final and injunctive relief with respect to the Class.

### Count I – Breach of Contract

145.    Plaintiffs fully incorporate by reference all of the above-stated paragraphs, as though fully set forth herein.

146.    MFA entered into a standard-form installment contract with Plaintiffs; namely, the MPN.  Pursuant to that MPN, MFA agreed to reduce the interest rate on the FFELP Loans to zero percent upon Plaintiffs and the Class making thirty-six months of on-time payments to MFA.

147.    In accordance with the above described installment contracts, Plaintiffs and the Class performed all that was required by the installment contracts.  Specifically, Plaintiffs and the Class did not enter into Federal Consolidation Loans after graduation and, instead, made timely monthly payments on their loans to MFA at rates that were higher than they could have paid had they chosen to consolidate their loans.

148.    MFA breached, and continues to breach, its contractual obligations, on a monthly basis, with Plaintiffs and the Class by failing to reduce the effective interest rate on their FFELP Loans to zero (0) percent.

149.    Each continuing month that MFA continues to impose interest charges, on Plaintiffs' applicable loans and refuses to credit the full payment to principal constitutes a separate and distinct breach of an installment contract.

150.    MFA's conduct in breaching and continuing to breach its contractual obligations is unjustified and unexcused under the terms of their standard-form MPN with Plaintiffs and the Class.

151.    As applicable, and in accordance with the MPN, the MFA "is subject to all claims and defenses" that Plaintiffs and the Class could assert against the school.

152.    Plaintiffs and members of the Class have been damaged by the MFA's failure to honor the term of the MPN and reduce the interest rate on the FFELP Loans to zero percent upon 36 months of on-time payments to MFA.

## Count II –Injunctive Relief

153. Plaintiffs fully incorporate by reference all of the above-stated paragraphs, as though fully set forth herein.

154. The Plaintiffs' FFELP Loans were for a term of ten to twenty-five years. The other FFELP Loans issued and/or purchased by MFA and the subject of this Class action were for the same or other durations.

155. MFA has engaged in conduct that has breached their contracts with Plaintiffs and the members of the Class, as alleged above, and will continue to act in a manner that will violate its future contractual obligations to Plaintiffs and the Class.

156. MFA's ongoing breaches of contract will require Plaintiffs and the members of the Class to repeatedly return to Court to enforce the same legal rights that are presently before this Court in an unlimited number of identical future proceedings. Under these circumstances, the remedy at law available to Plaintiffs and the Class is inadequate, as the Plaintiffs and the Class will suffer irreparable harm and injury from the repeated deprivation of their legal rights.

157. Accordingly, Plaintiffs and the Class request that the Court exercise its equitable injunctive powers to enjoin MFA from all future conduct that breaches its contracts with Plaintiffs and the members of the Class. Specifically, the Court is requested to enjoin all further interest charges imposed by the MFA in violation of the standard-form MPNs to Plaintiffs and the Class after they complete thirty-six months of on-time payments.

158. The rights and interests of the parties, the Court and the public will be judicially protected, and effectively served, by the granting of the requested injunctive relief to prevent and/or prohibit MFA from so acting.

## Count III – Unjust Enrichment

### (Pled in the Alternative to Count I - Breach of Contract)

159. Plaintiffs fully incorporate by reference all of the above-stated paragraphs, as though fully set forth herein.

160. MFA has received and will continue to receive interest from Plaintiffs and the Class that it would not have received had it not improperly and without justification rescinded the zero

COMPLAINT (CLASS ACTION)

percent interest rate on the FFELP Loans it originated and/or purchased under the MSF Program and thereby has received a benefit from Plaintiffs and the Class.

161. It would be inequitable to Plaintiffs and the Class for MFA to retain the benefit.

162. If it should be found that there was no express contract, then a contract should be implied to prevent the unjust enrichment of MFA.

## Count IV – Declaratory Judgment

163. Plaintiffs fully incorporate by reference all of the above-stated paragraphs, as though fully set forth herein.

164. Plaintiffs desire a judicial determination of their and the Class' rights and duties under the terms of the standard-form MPNs relating to the FFELP Loans originated and/or purchased by MFA under the MSF Program. Specifically, a present and actual controversy exists between Plaintiffs and the Class on the one hand and MFA on the other hand as to whether MFA is contractually or otherwise obligated to provide the zero (0) percent interest reductions to Plaintiffs and the Class as stated in MFA's disclosure statements that are incorporated into and thus binding upon MFA under the standard-form MPNs.

165. A judicial declaration is necessary and appropriate at this time under the circumstances in order that Plaintiffs and the Class may ascertain their rights and duties under the standard-form MPNs.

## Count V – Declaratory Judgment

## (By Plaintiff Randall Only)

166. Plaintiff Randall fully incorporates by reference all of the above-stated paragraphs, as though fully set forth herein.

167. Plaintiff Randall desire a judicial determination of his and the Class' rights and duties under the terms of the standard-form MPNs relating to the FFELP Loans originated and/or purchased by MFA under the MSF Program. Specifically, a present and actual controversy exists between Plaintiffs and the Class on the one hand and MFA on the other hand as to whether MFA is contractually or otherwise obligated to provide the zero (0) percent interest reductions to Plaintiff

Randall and some members of the Class that have (1) not made any late payments but (2) have not yet made thirty-six (36) months of on-time payments.

168. Plaintiff Randall's and affected Class member's claim for breach of contract against MFA has not yet accrued because the MFA is not yet required to perform its obligations under the MPN and incorporated disclosure statement.

169. At no time has the MFA or any other lender repudiated the terms of the Michigan Students First program to Plaintiff Randall.

170. Even if the MFA or another lender had repudiated such terms, the doctrine of anticipatory breach allows Plaintiff Randall and affected Class members to either (1) sue for anticipatory breach immediately or (2) continue to perform their obligations and sue when the MFA's performance is due.

171. There is no guarantee the MFA will be in possession of Plaintiff Randall's loans when the lender's performance is due.

172. Accordingly, Plaintiff Randall seeks a declaration that upon completing thirty-six months of on-time payments, that neither he nor any affected Class member is required to pay any amount in excess of the then-outstanding principal balance of the applicable federal student loans as long as all future payments are made in a timely fashion.

173. A judicial declaration is necessary and appropriate at this time under the circumstances in order that Plaintiffs and the Class may ascertain their rights and duties under the standard-form MPNs.

174. Moreover, such a judicial declaration is necessary and appropriate at this time under the circumstances in order to ensure that the issue is resolved under the doctrine of *collateral estoppel* to bar Defendant MFA or any other lender from attempting to collect an amount in excess of the outstanding principal balance from Plaintiffs and the Class in a collection or related action.

## **Prayer for Relief**

WHEREFORE, on behalf of themselves and the members of the Class, Plaintiffs pray for judgment as follows:

A.      For a Court order certifying that the Complaint may be maintained as a class action and appointing Plaintiffs and their undersigned counsel to represent the Class in this litigation;

B.      For a determination, adjudication and declaration of Plaintiffs and the Class' rights and MFA's corresponding obligations the standard-form MPNs relating to the FFELP Loans that were issued and/or purchased by MFA under the MSF Program.

C.      For a determination, adjudication and declaration of Plaintiffs and the Class' future payment obligations regarding their federal student loans in the future;

D.      Adjudge and decree that MFA has engaged in the wrongful conduct alleged herein;

E.      Award Plaintiffs and the Class damages for MFA's breach of contract, or alternatively, for MFA's unjust enrichment;

F.      Award Plaintiffs and the Class injunctive relief;

G.      Award Plaintiffs and the Class pre- and post-judgment interest as allowed by law;

H.      Award counsel for Plaintiff and the Class reasonable attorneys' fees and the costs of the suit; and

I.      For all such other relief as this Court may deem just and proper and may be available at law or equity.

### **Demand for Jury Trial**

Plaintiffs seek a trial by jury for all appropriate issues on each and every cause of action in this Complaint that allows for it.

Respectfully submitted,

RIDOUT LYON + OTTOSON, LLP

Dated: June 27, 2013        By:      /s/ *Caleb Marker*
                                              Christopher P. Ridout (CA Bar No.: 143931)
                                                  *Subject to Admission Pro Hac Vice*
                                              (c.ridout@rlollp.com)
                                              Caleb Marker (P70963)
                                              (c.marker@rlollp.com)
                                              555 E. Ocean Blvd., Suite 500
                                              Long Beach, CA 90802
                                              (562) 216-7380

David A. McKay (GA Bar No.: 494171)
*Subject to Admission Pro Hac Vice*
(d.mckay@rlollp.com)
555 North Point Center East, 4th Floor
Alpharetta, GA 30022
(404) 907-1870

SOMMERS SCHWARTZ, P.C.
Jason J. Thompson (P47184)
(JThompson@sommerspc.com)
Lance C. Young (P51254)
(LYoung@sommerspc.com)
2000 Town Center, Suite 900
Southfield, Michigan 48075
(248) 355-0300

HANK LAW, PLLC
Jeffrey A. Hank (P71152)
(jah@hanklegal.com)
P.O. Box 1358
East Lansing, MI 48826
(888) 490-8550

*Attorneys for Plaintiffs*